| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>-------------------------------------------------------x<br>:<br>In re:                                            :<br>                                                      :<br>         ERASMO MARTINEZ,           :<br>                                                      :<br>                              Debtor           :<br>-------------------------------------------------------x | **FOR PUBLICATION**<br><br><br><br>Case No.: 09-11067 (MG)<br>Chapter 13 |

### MEMORANDUM OPINION APPROVING DEBTOR'S CHAPTER 13 PLAN

*A P P E A R A N C E S:*

DAVID BRODMAN, ESQ.
627 Lydig Avenue
Bronx, NY 10462
*Counsel for the Debtor*

JEFFREY SAPIR, ESQ.
399 Knollwood Road
Suite 102
White Plains, NY 10603
*Standing Chapter 13 Trustee*
By: Jody Kava, Esq.

**MARTIN GLENN**
**United States Bankruptcy Judge**

### INTRODUCTION

This case presents the question whether a court should approve a debtor's chapter 13 plan that proposes to cram down a creditor's secured interest in an automobile that is not a so-called 910 vehicle. In determining whether to approve the chapter 13 plan proposed by Erasmo Martinez (the "Debtor"), the Court considers whether (1) the Debtor may bifurcate the secured claim of VNB Loan Services ("VNB") into secured and unsecured portions under § 506(a) of the Bankruptcy Code and cram down the secured

portion under § 1325(a)(5)(B)(ii), (2) the Debtor's proposed reduced value of the secured portion of VNB's claim is proper, and (3) the proposed interest rate on the secured portion of VNB's claim is appropriate. VNB did not object to the Debtor's plan confirmation or proposed plan treatment. The Court finds that the answer to all three questions is yes.

The Debtor may bifurcate the claim under § 506(a) into (1) the portion secured by the automobile and (2) the remaining unsecured portion, and may cram down the secured portion pursuant to § 1325(a)(5)(B)(ii). Bifurcation is appropriate since § 1325(a)(5)(B)(ii) permits a Debtor to cram down the secured portion of the claim to the current value of the car so long as the Debtor purchased the vehicle more than 910 days before filing the chapter 13 petition. The Debtor properly objected to the value of VNB's secured claim. The Debtor rebutted the prima facie validity of VNB's proof of claim by producing the Kelley Blue Book Private Party Value of the automobile, which VNB did not oppose. Additionally, in the absence of any other evidence offered by the secured creditor, the Kelley Blue Book Private Party Value is an appropriate measure of the value of the automobile for the purposes of the § 1325(a)(5)(B)(ii) cram down provision. Pursuant to § 506(a)(2), collateral in chapter 13 cases should be valued at the collateral's replacement value. As the price that a buyer can expect to pay when buying a used car from a private party, the Kelley Blue Book Private Party Value serves as a reasonable replacement value for the collateral.

The Debtor proposed that the interest rate on the secured portion of the claim be set at prime plus 2%. In the absence of any objection, the proposed rate is appropriate using the formula approach set forth by the Supreme Court. The Debtor's proposed risk

2

adjustment rate, a component of the total interest rate, adequately compensates VNB for the risk that the Debtor may default on his chapter 13 plan payments, and falls within the range of risk adjustment rates that courts generally have approved. Since VNB did not object to the Debtor's proposed interest rate, VNB has not met its burden of showing that the risk adjustment rate will not adequately compensate it for the risk of default. With the objection to VNB's claim resolved, and all other issues for confirmation having been satisfied, the Court confirms the Debtor's chapter 13 plan.

## I. BACKGROUND

The Debtor took out a loan to finance a 2004 Chevrolet Express Van ("Chevrolet") from VNB on January 1, 2005. On March 10, 2009, more than 910 days after taking out the loan, the Debtor filed a chapter 13 petition. On March 23, 2009, VNB filed a secured claim (Proof of Claim No. 2) in the amount of $12,213.15 based on the Chevrolet loan. The Debtor alleges that as of March 10, 2009, the petition date, the Kelley Blue Book Private Party Value of the Chevrolet was $9,430.00.[1] Accordingly, the Debtor maintains that the secured portion of VNB's claim is $9,430.00, leaving the remainder of the claim unsecured.

On May 20, 2009, the Debtor filed a motion pursuant to Bankruptcy Code § 506(a) and FED. R. BANKR. P. 3015 objecting to VNB's $12,213.15 secured claim. The Debtor seeks to reduce the secured portion of VNB's claim to $9,430.00. The Debtor proposes to pay VNB the value of its security interest of $9,430.00 plus 5.25% interest in 36 monthly installments. This proposed 5.25% interest rate is the sum of the 3.25%

---

[1] The Debtor attached as Exhibit A to its Motion a printout from the Kelley Blue Book website, showing that the private party value of the Chevrolet in good condition as of May 20, 2009 was $8,665.00. Although the Private Party Value of the Chevrolet was $8,665.00 as of May 20, 2009, the Debtor consents to using the March 10, 2009 petition-date value of $9,430.00.

3

Prime Rate of Interest and a 2% risk premium. Taking into account the 5.25% interest rate and the $9,430.00 Kelley Blue Book Private Party Value of the Chevrolet, the Debtor will pay $10,212.69 in total to VNB on the secured claim. The unsecured deficiency claim of $2,783.15 will be paid pro rata with other unsecured claims without interest. Subject to approval of the reduction of VNB's secured claim to $9,430.00 and the 5.25% interest rate, the Debtor seeks approval of its chapter 13 plan, which calls for payments of $575.00 per month for 36 months.

## II. DICUSSION

### A. Value of VNB's Secured Loan

The Debtor's objection to the value of the secured claim of $12,213.15 is grounded in § 506(a) of the Bankruptcy Code, which permits bifurcation of a claim into secured and unsecured portions. Section 506(a)(1) provides:

> An allowed claim of a creditor secured by a lien on property . . . is a secured claim to the extent of the value of such creditor's interest . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.

11 U.S.C. § 506(a)(1). Thus, § 506 bifurcates a claim into secured and unsecured portions, "with the secured portion limited to the value of the collateral at the time of filing, and the unsecured portion equal to the difference between the collateral's value and the balance of the loan." *In re Quick*, 371 B.R. 459, 461-62 (10th Cir. BAP 2007).[2]

---

[2] When a motor vehicle is used as collateral, there is often an issue of the so-called "hanging paragraph" of § 1325(a) of the Code. The hanging paragraph limits bifurcation of a claim in a chapter 13 case when the secured claim arises from a motor vehicle acquired for the debtor's personal use within 910 days prior to the petition date. 3 NORTON BANKR. L. P. 3d § 52:2 (2009). Since the Chevrolet was acquired more than 910 days before the chapter 13 petition was filed in this case, the hanging paragraph does not apply and bifurcation under § 506 does apply.

4

Bifurcation of VNB's $12,213.15 claim into secured and unsecured portions is appropriate in this case. In its motion to reduce the claim, Debtor satisfied its burden of proof relating to claims objections. A proof of claim filed in accordance with FED. R. BANKR. P. 3001 is "prima facie evidence of the validity and amount of the claim." FED. R. BANKR. P. 3001(f). To rebut the presumption of the claimant's prima facie case, an objecting party is required to produce "sufficient evidence to negate one or more of the sworn facts in the proof of claim." *In re Allegheny Intern., Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992). The objecting party carries the burden if the evidence it produces is equal in probative force to the claim. BANKR. PROC. MANUAL § 3001:6 (2008); *see In re Alleghany Intern.,* 954 F.2d at 173-74. At that point, the burden shifts back to the claimant to produce additional evidence proving the validity of the claim by a preponderance of the evidence. BANKR. LAW MANUAL § 6:7 (5th ed. 2008).

The Debtor's Kelley Blue Book printout constitutes competent evidence of the Chevrolet's replacement value, thus rebutting the prima facie validity of VNB's claim. VNB did not attach any material to its Proof of Claim indicating the source of the $12,213.15 valuation. Accordingly, the Debtor's Kelley Blue Book printout is superior in probative force to the claim. VNB did not subsequently respond or produce any additional evidence to prove the value of its secured claim. Therefore, pursuant to § 506(a) of the Code, which allows the secured claim to be reduced to the value of the underlying collateral, the Debtor's objection is sustained. VNB's claim should properly be bifurcated into a $9,430.00 secured claim and a $2,783.15 unsecured claim.

Additionally, the Kelley Blue Book Private Party Value as of the petition date is an appropriate measurement of the value of the Chevrolet for purposes of the §

5

1325(a)(5)(B)(ii) cram down provision. Under § 1325(a)(5)(B), the court shall confirm a plan if:

> (i) the plan provides that --
>    (I) the holder of such claim retain the lien securing such claim . . . and . . .
> (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim.

11 U.S.C. § 1325(a)(5)(B). Section 506(a) governs the allowed amount of the secured claim generally and 506(a)(2), added as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, specifically governs valuation for chapter 7 and 13 cases. Section 506(a)(2) provides that:

> If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

11 U.S.C. § 506(a)(2).[3]

---

[3] A valuation date issue arises out of the relationship between the two sentences of § 506(a)(2). The first sentence provides that value shall be determined at the time the petition was filed. The second sentence notes if personal property was acquired for personal, family, or household use in chapter 7 and 13 cases then "replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property *at the time value is determined.*" 11 U.S.C. § 506(a)(2) (emphasis added). Whether the clause "at the time value is determined" supersedes the petition date standard and allows for value to be determined at a different date for purposes of property under the second sentence is not entirely clear. *See In re Morales*, 387 B.R. 36, 43-46 (C.D. Cal. 2008) (analyzing § 506(a)(2) and noting the lack of uniform interpretation). The issue has not been resolved in the Second Circuit, and other courts have used both standards. *See id.* at 47 (holding that § 506(a)(2) requires "value to be determined as of the petition date, not the hearing date"); *In re Maryland*, No. 06-10283, 2006 WL 1476927, at *3 (Bankr. M.D.N.C. May 26, 2006) (determining value as of petition date); *In re Cheatham*, No. 07-40509-13, 2007 WL 2428046, at *2 (Bankr. W.D. Mo. June 19, 2007) (using value as of hearing date and noting that courts must use "the value at the time the determination is being made"); *see also* 4 Collier on Bankruptcy ¶ 506.03, p. 506-76.1 (rev. 15th ed. 2006) (explaining that for property governed by sentence 2 of § 506(a)(2), the date value is determined "will often be the date of confirmation"). However, the Court need not decide the issue whether the proper valuation date is the petition date or the confirmation date since the Debtor has consented to using the petition date value of $9,430.00 rather than the lower confirmation date value of $8,665.00.

6

Section 506(a)(2) was added to the Code after the Supreme Court decided *Associates Commercial Corporation v. Rash*, 520 U.S. 953 (1997). In *Rash*, the Supreme Court addressed the question how to value collateral when a debtor invokes the cram down option under § 1325(a)(5)(B). The *Rash* Court found that where the debtor retained the collateral, the collateral should be valued at its replacement value. *Id.* at 965. In choosing the replacement value, the Court articulated that in a cram down case, "the value of the property (and thus the amount of the secured claim under § 506(a)) is the price a willing buyer in the debtor's trade, business or situation would pay to obtain like property from a willing seller." *Id.* at 960.

In reaching this conclusion, the *Rash* Court looked to § 506(a), which states that the value of the collateral "shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property." *Id.* at 961. The Court determined that the replacement-value standard "accurately gauges the debtor's 'use' of the property," and that "the actual use, rather than a foreclosure sale that will not take place, is the proper guide under a prescription hinged to the property's 'disposition or use.'" *Id.* at 963.

Section 506(a)(2) codified *Rash* by requiring that the collateral's value be determined by its replacement value. It further provides that for property acquired for personal, family, or household purposes, replacement value means the value a retail merchant would charge for the property. Although courts have approved several different methods for finding a car's replacement value, some courts have approved the use of the Kelley Blue Book Private Party Value. *In re De Anda-Ramirez*, 359 B.R. 794, 796, 798 (10th Cir. BAP 2007). The Kelley Blue Book Private Party Value is what a

7

buyer can expect to pay when buying a used car from a private party, a good match with the replacement-value standard promulgated by the *Rash* Court: the "price a willing buyer in the debtor's trade, business or situation would pay to obtain like property from a willing seller." *Rash*, 520 U.S. at 960.

In *In re Kidwell*, the court found that the Kelley Blue Book Private Party Value was a better measure of the car's replacement value than a value based on the N.A.D.A. Official Used Car Guide, another source often used to determine a car's replacement value. *In re Kidwell,* 2007 WL 2934866, at *5 (Bankr. E.D. Tenn. Oct. 4, 2007) ("The court is satisfied that the debtor's expert witness's explanation of the Kelley Blue Book "private party" valuation is more in alignment with the standard of § 506(a)(2) requiring replacement value based upon the retail price a retail merchant would charge the debtor."). *See also In re De Anda-Ramirez*, 359 B.R. at 798 (approving the lower court's decision that the Kelley Blue Book Private Party Value served as an appropriate measure of a car's replacement value). Although the Kelley Blue Book Private Party Value is not always used as the replacement value, VNB has not objected to its use. Therefore, the Court concludes that the unrebutted evidence supports that value here.

**II.  Interest Rate Determination**

The Debtor's proposed interest rate on the secured portion of VNB's claim must be appropriate for the plan to be confirmed. The secured creditor must receive interest payments when its claim is modified under the § 1325(a)(5)(B) cram down provision and paid in installments.

The § 1325(a)(5)(B) cram down provision allows a debtor to keep secured property over the creditor's objection. *Rash*, 520 U.S. at 957. The creditor retains a lien

8

securing the claim, and the debtor must compensate the creditor with installment payments throughout the plan. *Id.* "[T]he amount of each installment must be calibrated to ensure that, over time, the creditor receives disbursements whose total present value equals or exceeds that of the allowed claim." *Till v. SCS Credit Corp.*, 541 U.S. 465, 468 (2004). Thus, the debtor must pay interest on a secured claim that is paid in installments. *See id.* at 466. The Bankruptcy Code, however, does not provide guidance on how to determine this interest rate. *See id.* at 473.

In *Till*, the Supreme Court addressed what method to use when determining the interest rate on a secured claim under the cram down provision. *Id.* at 466. Invoking the cram down provision, the debtor's plan bifurcated an undersecured claim into secured and unsecured portions. *Id.* at 470. The plan further proposed a 9.5% interest rate on the secured portion of the claim, as calculated pursuant to the "formula rate." *Id.* at 471. However, the creditor argued that 21%, the rate provided in the original loan agreement, was more appropriate. *Id.* at 470-71. After considering four different methods used by lower courts, the Court held that the formula approach is the appropriate method for calculating interest on a cram down loan. *Id.* at 479-80.

The *Till* Court defined the formula approach as the national prime rate plus an additional risk adjustment rate, which accounts for the debtor's risk of nonpayment. *Id.* at 479. The national prime rate "reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower." *Id.* The risk adjustment rate reflects that bankrupt debtors typically pose a greater risk of defaulting than commercial debtors. *Id.* In selecting the formula approach, the Court reasoned that § 1325(a)(5)(B) does not require a court to use the rate provided in the original loan, nor

9

consider the creditor's individual circumstances, prior dealings with the debtor, or alternative loans if permitted to foreclose. *Id.* at 476-77. In fact, § 1325(a)(5)(B) only requires that the distributions under the claim equal the present value of the secured claim. *Id.* at 474. Thus the formula approach best comports with the Bankruptcy Code, since it "depends only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor." *Id.* at 466. Additionally, the Court found that the formula approach "entails a straightforward, familiar, and objective inquiry, and minimizes the need for potentially costly additional evidentiary hearings." *Id.* at 479.

The *Till* Court did not define how to compute the risk adjustment. *Id.* at 480. However, the Court provided some guidance in noting that § 1325 "obligates the court to select a rate high enough to compensate the creditor for its risk but not so high as to doom the plan." *Id.* at 480. Courts generally have approved a risk adjustment rate of 1% to 3%. *See id.* at 481; *see also In re Valenti*, 105 F.3d at 64 ("[T]he risk premium has been set by bankruptcy courts at from one to three percent.").

In *In re Bivens*, the court applied the formula approach in approving a risk adjustment rate of 2.25%. 317 B.R. 755, 764, 770 (Bankr. N.D. Ill. 2004). The debtor's car secured the original claim, which was bifurcated pursuant to the cram down provision. The *Bivens* court stated that, in determining an appropriate risk adjustment rate, a court should consider "evidence included in the debtor's bankruptcy filings, such as work history, job stability, cash flow, disposable income, the existence or absence of prior bankruptcy filings, and the contents of the Chapter 13 plan." *Id.* at 764. In

10

determining that a 2.25%[4] risk adjustment rate would adequately compensate the creditor for the debtor's risk of default, the court noted that the debtor was employed at a job she had held for four years without disruption, and regularly received support payments from her former husband. 317 B.R. at 768-69.

Courts in other jurisdictions have approved risk adjustment rates within the 1% to 3% range on claims secured by a debtor's car. *See In re Gunau*, 335 B.R. 334, 337 (M.D. Fla. 2006) (ordering debtors to modify chapter 13 plan to include risk adjustment rate of 2% on claim secured by debtor's car); *In re Pokrzywinksi*, 311 B.R. 846, 850-51 (E.D. Wis. 2004) (ordering debtor to pay risk adjustment rate of 1.5% on claim secured by debtor's car); *In re Harken*, No. 04-02914, 2004 WL 3019467, at *1, 2 (Bankr. N.D. Iowa Nov. 29, 2004) (accepting debtor's proposed risk adjustment rate of 3% on claim secured by debtor's car); *In Re Collins* 167 B.R. 842 (Bankr. E.D. Tex.1994) (overruling creditor's objection to risk adjustment rate of 2.3% on claim secured by debtor's car).

When a creditor objects to the risk adjustment rate proposed by the debtor, courts have found that the creditor bears the evidentiary burden to establish the need for a higher rate. *Till*, 541 U.S. at 479 ("[S]tarting from a concededly *low* estimate and adjusting *upward* places the evidentiary burden squarely on the creditors . . . ."); *see, e.g., In re McCormick*, 2006 WL 3499226, at *5 (Bankr. E.D. Wis. Dec. 5, 2006) (requiring no risk premium over prime rate because creditor objecting to cram down failed to provide evidence showing that the debtor was likely to default on the plan); *see also In re Pringle,* 2006 WL 2528502, at *6 (W.D.N.Y. Aug. 31, 2006) ("At all times, the secured creditor bears the evidentiary burden to establish the need for an interest rate higher than

---

[4] The court rejected the creditor's proposed risk adjustment premium of 14.2%, which, added to the prime rate of 4.75%, totaled 18.95%, the original contract rate. *In re Bivens*, 317 B.R. at 764.

11

the one proposed by the Chapter 13 debtor."). The creditor must meet its burden at an evidentiary hearing where the debtor and any creditor may present evidence about the appropriate risk adjustment. *Till*, 541 U.S. at 479.

This burden falls on the creditors because the creditors may have access to information that is absent from the debtor's filing. *Id.* Creditors tend to have more experience and knowledge of the lending markets since it is necessary to gather information about their lending markets to remain competitive. *Id.* at 484. Any relevant information a debtor has access to is likely already included in the debtor's bankruptcy filings. *Id.* at 484.

Following *Till* and its progeny, the Debtor's proposed payment of VNB's claim at the cram down interest rate of 5.25% (the prime rate plus a 2% risk adjustment) is appropriate. VNB bears the burden of showing that the proposed risk adjustment rate should be higher, but did not object to confirmation of the Debtor's proposed chapter 13 plan. Additionally, the Debtor's proposed risk adjustment rate of 2% falls within the 1% to 3% range that courts typically approve. *See In re Gunau*, 335 B.R. at 337. Under these circumstances, an evidentiary hearing is unnecessary.

The Debtor's proposed 2% risk adjustment rate is also appropriate in light of the factors considered by the *Bivens* court. The Debtor has not filed any other bankruptcies within the last eight years. Additionally, the Debtor is currently employed and has been employed for seven years at the same company. The Debtor's current average monthly income, combined household monthly income, expenses, and monthly household net income merit approval of the Debtor's proposed 2% risk adjustment rate.

## CONCLUSION

The Debtor may bifurcate VNB's claim pursuant to § 506(a), and the secured portion may be crammed down to the present value of the Debtor's automobile pursuant to § 1325(a)(5)(B)(ii). The Debtor successfully rebutted VNB's original claim of $12,213.15 by providing the Kelley Blue Book Private Party Value of the Chevrolet at $9,430.00. The Debtor's proposed interest rate on the modified secured portion of VNB's claim is appropriate. In these circumstances, it does not appear that an evidentiary hearing is warranted. There are no further issues respecting confirmation and the Court hereby confirms the plan.

DATED:    July 28, 2009
          New York, New York


                                    /s/Martin Glenn
                                MARTIN GLENN
                                United States Bankruptcy Judge